# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GINGER A. GUDE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Civ. No. 08-832-SLR | |
| | ) | |
| ROCKFORD CENTER INC., LINDSEY | ) | |
| MCCOY, and MARY W. SCHAEFER, | ) | |
| | ) | |
| Defendants. | ) | |

Ginger A. Gude, Elkton, Maryland.  Pro se Plaintiff.

Megan Trocki Mantzavinos, Esquire, Marks, O'Neill, O'Brien & Courtney, P.C., Wilmington, Delaware.  Counsel for Defendants.

## MEMORANDUM OPINION

Dated:  March عاثر , 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On September 18, 2008, Ginger A. Gude ("plaintiff"), proceeding pro se, filed suit against Rockford Center, Inc. ("Rockford"), Mary W. Schaefer ("Schaefer"), and Lindsey McCoy ("McCoy") (collectively "defendants") in the Superior Court of the State of Delaware alleging employment discrimination on the basis of age, and retaliation.  (D.I. 1)  Because the complaint alleged diversity jurisdiction as well as violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.,* and the Family and Medical Leave Act, ("FMLA"), 28 U.S.C. §§ 2601 *et seq.*, defendants filed a notice of removal.  (*Id.*)  The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332(a)(2).  Presently before the court is defendants' motion for summary judgment, plaintiff's response, and defendants' reply.[1]  (D.I. 17, 18, 27, 29, 33, 34)  For the reasons discussed below, the court will grant defendants' motion for summary judgment.  (D.I. 17)

## II. BACKGROUND

Plaintiff alleges discrimination on the basis of age, constructive discharge, and retaliation.  (D.I. 1; D.I. 18, exs. A I at 55, A II at 134)  Plaintiff identifies discriminatory acts of:  (1) incomplete performance evaluations, (2) failure to receive tuition reimbursement, and (3) retaliation in the form of unfavorable references after she filed discrimination charges.  (D.I. 18, exs. A I at 55-56, A II at 133, A IV)

---

[1]Rockford and Lindsey filed their motion for summary judgment on July 27, 2009, and renewed the motion on November 18, 2009.  (D.I. 17, 27)  Schaefer adopted their motion for summary judgment on November 18, 2009.  (D.I. 29)

Plaintiff, who is over the age of forty, has a bachelor's degree in nursing and is a licensed registered nurse. Plaintiff was hired by Rockford on March 22, 2002 as a staff nurse specializing in psychiatric mental health nursing, and remained employed by Rockford until April 14, 2007. (*Id.*, exs. A I at 8-9, 23, 28, A III, B ¶ 3; D.I. 36 at ROCK0147)

Schaefer was the human resources director at Rockford until January 2008.[2] Plaintiff met with Schaefer at the time of her hire on March 22, 2002, and Schaefer participated in plaintiff's orientation session. On her hire date, plaintiff signed an acknowledgment that she was provided with a copy of the Employee Handbook ("handbook") and Human Resources Policies. The handbook provides for regular performance appraisals. It also contains a section on promotions, transfers, and disciplinary measures meted out under a system of progressive discipline, as well as drug and/or alcohol testing under three scenarios, including "reasonable suspicion drug and/or alcohol testing." (D.I. 18, exs. A I at 30-32, A II at 171, A III at 20-23, B ¶ 2)

On the same day that plaintiff received a copy of the handbook, she signed an acknowledgment that she received a copy of the leave of absence policy. Plaintiff did not recall when she received the leave of absence policy, and testified that she looked up the policy in Rockford's binders and retrieved it herself. The handbook's leave of absence section provides that requests and approvals must be in writing and employees are eligible for leaves of absence under the FMLA after meeting certain time

---

[2]On October 7, 2008, there was an unsuccessful attempt to serve Schaefer at Rockford with summons and a complaint. (D.I. 34, ex. L)

requirements. Medical, parental, family care, personal, and military are categories allowed for leaves of absences. (*Id.*, exs. A I at 35-37, A III)

**Promotions**. During her interview, plaintiff was told that after a year's employment and depending upon her performance, she could be promoted.[3] Supervisory positions were not posted when plaintiff was first employed, but were later. Plaintiff assumed that she did not have to apply for a promotion, but would be selected for one.[4] She was never approached about a promotion, nor was the possibility of a promotion suggested. She saw different vacancy bulletins posted, but testified that promotions were not given to the older population.[5] Plaintiff did not express an interest in posted positions because she "had her hands full" going to school, working on her attendance, and with family problems. Plaintiff had attendance problems, and testified that her attendance would have been an impediment to an offer of a promotion. (*Id.*, ex. A II at 110-114)

According to plaintiff, many senior nurses complained that younger nurses were selected for higher level management positions, but she was unaware of older nurses who had applied for, or expressed an interest in, supervisory positions. Plaintiff had no facts that Lindsey McCoy ("McCoy"), a nursing supervisor/manager, engaged in

---

[3]Plaintiff received annual pay increases. (*Id.*, ex. A II at 127-128)

[4]At some point in time, plaintiff was promoted to a charge nurse position and received a pay increase. She testified that Schaefer discriminated against her because her human resources file indicated that she was a staff nurse when, in fact, she had been promoted to a charge nurse and, because of an error, at times she was not paid as a charge nurse. (*Id.*, exs. A I at 28, A II at 127, 169-170)

[5]The record contains a Rockford newsletter that lists open positions. (D.I. 36 The Rockford Center Chronicle, Jan. 3, 2007)

3

favoritism in the decision-making process with respect to plaintiff's employment as a charge nurse versus promotion to a nurse supervisor. She testified that there was favoritism towards nursing supervisors/managers McCoy and Aleta Mancuso ("Mancuso") because they were both younger.[6] According to plaintiff, there was friction among the nurses, and rumors circulated by the nurses were typically directed at the older nurses. Rumors were also spread about younger nurses. (*Id.* exs. A I at 65-73, A II at 127, 157-163, 187-191, A IV Pl.'s answer to interrog No. 3)

**Drug testing.** In February 2006, director of nursing Cole told plaintiff that she was required to submit to a drug test. Plaintiff does not know if McCoy decided plaintiff would be tested or if the requirement was the result of discrimination. Plaintiff explained there had been a series of ongoing narcotics thefts and it was common knowledge that narcotics were missing from various areas of the hospital, including the unit where plaintiff worked ninety percent of the time. Plaintiff does not recall if others were tested the day she was, but indicated that, at other times, employees were required to undergo testing. She knew of two nurses over the age of 40 and one younger nurse who were required to undergo drug testing as a result of the missing narcotics. (*Id.*, exs. A I at 60-65, 74-77, A II at 168)

**Evaluations.** Plaintiff requested, and was given, access to her performance evaluations. According to plaintiff, she read and signed only two performance evaluations; there were no others that she saw, but did not sign. The record, however,

---

[6]McCoy assumed the nurse manager position on January 6, 2006. At that time the management team consisted of McCoy and Matt Thompson ("Thompson") as nurse managers; Deb Cole ("Cole") as evening shift supervisor and alternate supervisors Alex Dunlap, Mancuso, Ashley Borkowski and Mary Knarr. (D.I. 36 Jan. 6, 2006 memo)

contains appraisals signed by plaintiff on January 13, 2005, August 15, 2005, and December 29, 2005. These appraisals indicated she met expectations. A January 2005 evaluation noted that plaintiff had one counseling session regarding attendance and that it remained an issue. That evaluation stated, "if attendance and trainings were not problematic, Ginger would exceed if not meet superstar performance." The August 2005 appraisal noted absenteeism. An unsigned performance evaluation noted that plaintiff had twenty-one call outs from January through June 2006 and she needed development. (D.I. 18, ex. A II at 120-123; D.I. 36 ROCK0401-0405, ROCK0408)

**Tuition reimbursement**. Plaintiff attended classes at a local university in 2003 and 2004. Although the employee handbook provides for tuition reimbursement, plaintiff never requested it. Plaintiff made a written request, and received, paid time off during the time she attended the university.[7] (D.I. 18, exs. A II at 128, 150, A III at 30-31)

**Attendance**. Plaintiff does not recall anyone speaking to her about her attendance prior to a September 2004 meeting that occurred as a result of a September 2, 2004 written warning she received regarding her attendance and trend of excessive calling off, particularly when combined with previously scheduled days off.[8] (*Id.,* ex. A III at ex. 8) The director of nursing and nurse manager Michelle Stokes ("Stokes")

---

[7]Plaintiff testified that McCoy had nothing to do with the tuition reimbursement issue. (*Id.*, ex. A II at 159)

[8]The written warning advised plaintiff that her behavior violated the attendance policy and warned that her failure to comply with the policy would result in progressive disciplinary action up to, and including, termination. Plaintiff recalled that her absences centered around a family problem, and testified that she has a son who is disabled and at times needed urgent assistance. (*Id.*, exs. A I at 47, 50, A III at ex. 8)

5

attended the meeting.  Plaintiff does not recall Stokes mentioning her age during the

meeting.  Plaintiff recalled another meeting, this time with Schaefer, Mancuso, and

"Kathy" to discuss her attendance, but did not indicate when that meeting occurred.[9]

(Id., exs. A I at 43-46, 49, A II at 174, A III at ex. 8)  At this meeting, according to

plaintiff, her interactions with Schaefer generally concerned attendance issues.[10]

In 2006, plaintiff received a written warning that she had excessive call-offs for

the first quarter and was asked to "come in compliance for [the second] quarter."[11]  On

October 11, 2006, plaintiff received a verbal warning concerning her number of call-offs.

The next day she met with Schaeffer and director of nursing Dee Seth regarding her

attendance.[12]  At the formal meeting, plaintiff was advised that her attendance was

unsatisfactory and that she could notify Cambridge (apparently a counseling service);

she apparently was uncomfortable with the service and did not follow up.  (D.I. 18, exs.

A I at 52, A II at 175; D.I. 36 ROCK0330-31 and May 22, 2007 harassment

questionnaire No. 2)

---

[9]Presumably, plaintiff refers to Kathy Musleth, the director of clinical services in 2006.  (Id., ex. A IV, Pl.'s answer to interrog. No. 3)

[10]Plaintiff was never told directly that her schedule was changed due to attendance issues but, later on, she was told by the clinical director of nurses that if she did not "get it together," Rockford would change her schedule.  The schedule change was a problem for plaintiff because it affected her family life.  (Id., ex. A II at 137-38, 140-141)

[11]Plaintiff did not recall attending a meeting in connection with the memo.  The warning contains a written notation stating, "I know you've had something come up." (Id., ex. A III at ex. 9)  In 2006, plaintiff's sister had medical problems and was frequently in and out of the hospital.  (Id., ex. A I at 51-53)

[12]Plaintiff had thirty call-offs in six months and was warned that further call-offs would result in the potential termination of employment.  (D.I. 36 ROCK0330)

A corrective action report (dated March 12, 2007) states that plaintiff called out a total of eleven shifts in 2007. It noted that plaintiff had previously been counseled or disciplined for the same reason on October 11, 2006. Plaintiff refused to sign the corrective action report. (D.I. 36 ROCK0345)

On April 10, 2007, plaintiff met with a human resources representative,[13] McCoy, Thompson, and Mancuso after receiving a telephone call from Mancuso who asked plaintiff to attend a meeting.[14] During the meeting, plaintiff was told that she needed to sign a write-up sheet, also known as a corrective action report, "right away" regarding her absences and that, if she had one more absence without permission, she could be written up and terminated.[15] The report states that plaintiff had been previously counseled for the same reason on March 12, 2007. Plaintiff refused to sign the employee corrective action report. A notation on the report indicates that plaintiff met with Rockford's Human Resources Director, Jessica Jeppi ("Jeppi"), who discussed the FMLA and gave plaintiff forms for completion. Plaintiff testified that she was given a blank form to request family and medical leave that day, but she never filled it out. She also testified that she never requested leave, but hoped that it would be offered to her. Following the April 10th meeting, plaintiff submitted an undated resignation letter stating,

---

[13]The human resources representative was not Schaefer.

[14]Plaintiff testified that she had only one interaction with McCoy that was confrontational and that it occurred during the 2007 meeting when her attendance problems were discussed. (*Id.*, ex. A II at 168)

[15]The employee corrective action report states that plaintiff called out for a total of fourteen shifts in 2007. (*Id.*, ex. A III at ex. 7)

"as per my decision and our conflicts from 4/10/2007 I officially resigned [sic]."[16]

Rockford's payroll action form indicates there was a voluntary separation for personal

reasons, and that plaintiff's last day worked was April 14, 2007. (D.I. 18, exs. A I at 27-

28, 38-41, 53-54, A III at ex. 10, A IV at Pl.'s answer to interrog. No. 3; D.I. 36

ROCK0147, ROCK0344)

**Retaliation**. Plaintiff filed charges with the Delaware Department of Labor

("DDOL") in May and October 2007. The DDOL issued its final determination and right

to sue notice on July 31, 2008. Plaintiff sought employment following her resignation

and, when asked about potential employers, she testified that she did not know if they

contacted Rockford to verify her employment or if Rockford provided any information to

potential employers. According to Jeppi, Rockford received several requests from

potential employers for information regarding plaintiff's employment at Rockford; the

requests were responded to (in accordance with Rockford's policy) with service letters

provided to potential employers.[17] Plaintiff testified that, since her resignation, she has

looked for employment, but "every single door was slammed tight with [her] name on it,

using Rockford." While plaintiff testified that she has not held a job since she left

---

[16]Plaintiff previously submitted resignation letters on September 3, 2003 and September 8, 2004. The 2004 resignation letter contained a litany of complaints regarding her employment at Rockford, but did not mention age discrimination. (D.I. 34, ex. M)

[17]The record contains a service letter issued on February 19, 2008, and provides plaintiff's dates of service. The letter checkmarked "the employee was directly involved on a daily or frequent basis providing services and/or care to clients/patients/residents/ children"; the employee resigned; and "the employee was never counseled, warned, reprimanded, suspended or discharged as a result of reasonably substantiated incidents involving violent behavior in the workplace, abuse of negligence/neglect of patients/clients/residents/children. (D.I. 36 ROCK0374-75)

Rockford, she also testified that she was employed as a nurse from May 12, 2007 to July 29, 2007 and from September 10, 2007 to January 5, 2008. (D.I. 18, exs. A I at 56-58, A II at 102-04, 133-34, A IV, B, B3)  The record reflects that plaintiff left both positions.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  The facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences from the evidence must be drawn in that parties' favor. *Conopco, Inc. v. United States*, 572 F.3d 162, 165 (3d Cir. 2009).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).  Defendants move for summary judgment on the grounds that plaintiff cannot prove the facts necessary to state her claim.  Plaintiff opposes the motion.

9

## IV. DISCUSSION

### A. Service

Defendants argue that the claims against Schaefer must be dismissed because she was not served within one hundred twenty days following filing of the complaint on September 18, 2008, in violation of Fed. R. Civ. P. 4(m) and Del. Super. Ct. R. 4(j). Plaintiff responds that "this should have been a joinder of party's with multiple defendants. I paid only the fees to move action litigation into superior court." (D.I. 33 at 60)

Rule 4(m) of the Federal Rules of Civil Procedure states that, "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action."[18] Fed. R. Civ. P. 4(m). Rule 4(m) goes on the state that, "[u]pon a showing of good cause for the failure to serve, the court must extend the time for service; [and] the court can, at it discretion, extend the time for service even if plaintiff has not shown good cause for the delay." *Daniels v. Correctional Med. Services*, 380 F. Supp. 2d 379, 384 (D. Del. 2005) (citing Fed. R. Civ. P. 4(m)); *MCI Telecomm. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1098 (3d Cir. 1995).

The complaint was filed on September 18, 2008, and Schaefer has never been served. Plaintiff relies upon her filing fee receipt from the Superior Court of Delaware, New Castle County and two money orders for service fees as evidence of service. (D.I.

---

[18]Rule 4(j) of the Delaware Superior Court Rules is modeled after Fed. R. Civ. P. 4(m). Del. Super. Ct. R. 4(j).

36) She has not refuted, however, the return of writ without service for Schaefer dated October 23, 2008, that indicates the attempt to serve Schaefer was unsuccessful.

Plaintiff filed this case and it is her responsibility to see that the defendants are timely served. The court finds that plaintiff has not shown good cause for her failure to timely serve Schaefer. Therefore, the court will grant the defendants' motion in this regard; all claims against Schaefer are dismissed for failure to timely serve.

## B. Age Discrimination

Although no specific statute is mentioned, the complaint alleges employment discrimination on the basis of age. Under the ADEA, "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a). Protection under the ADEA is limited to individuals forty years of age or older. 29 U.S.C. § 631(a). Because there is no direct evidence of age discrimination, plaintiff's ADEA claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[19] *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337-38 (3d Cir. 2002).

---

[19]The *McDonnell Douglas* burden shifting framework is inapplicable in employment discrimination cases wherein the plaintiff presents "direct evidence" of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). Direct evidence of discrimination is defined as evidence that is so revealing of a discriminatory animus that it is not necessary for the plaintiff to rely on a presumption from his or her prima facie case to shift the burden of production to the defendant. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097-98 (3d Cir. 1995).

Plaintiff has the initial burden of establishing a prima facie case of discrimination by demonstrating that: (1) she is a member of a protected class, i.e., that she is over forty years of age; (2) she is qualified for the position; (3) she suffered an adverse employment decision; and (4) she was ultimately replaced by someone sufficiently younger to permit an inference of age discrimination. *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001). An adverse employment action must be "sufficiently severe as to alter the employee's compensation, terms, conditions or privileges of employment, or to deprive or tend to deprive [her] of employment opportunities or otherwise adversely affect [her] status as an employee." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296-97 (3d Cir. 1997) (internal citation and quotations omitted). Plaintiff's "evidentiary burden at [the prima facie] stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent - i.e., that discrimination could be a reason for the employer's action." *Marzano v. Computer Sci. Corp.*, 91 F.3d 497, 508 (3d Cir. 1996). This initial burden is not intended to be onerous. *Id.*

When a plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant employer "to articulate some legitimate nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. A defendant's burden is relatively light and is satisfied if the defendant articulates a legitimate reason for the adverse employment action. *See e.g., Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997). The burden then shifts back to the plaintiff to demonstrate that the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

143 (2000); *see also Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Evidence

that an employer's stated reasons for an adverse employment action are unworthy of

credence is one form of circumstantial evidence that a plaintiff can use to establish the

existence of intentional discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100

(2003). However, it is not enough to show that the employer made a wrong or mistaken

decision. *Coulton v. University of Pa.*, 237 F. App'x 741, 747 (3d Cir. 2007) (not

published). Instead, plaintiff must uncover "weaknesses, implausibilities,

inconsistencies, or contradictions" in the employer's explanation that would allow a

reasonable factfinder to believe that the employer did not truly act for the asserted

reason. *Id.* (citations omitted).

Defendants move for summary judgment on the grounds that no evidence exists

to support plaintiff's claim of age discrimination as she cannot establish a prima facie

case of discrimination, cannot rebut defendants' legitimate non-discriminatory business

decisions, and offers no evidence that defendants' actions were pretextual or

discriminatory.[20]

### 1. Individual liability

Initially, the court notes that plaintiff names as individual defendants McCoy and

Schaefer.[21] Defendants argue that plaintiff has provided no basis to assert a claim

---

[20]Defendants discuss plaintiff's age discrimination and constructive discharge claims together. The court will discuss them separately.

[21]As discussed above, Schaefer has not been served and she has been dismissed as a defendant.

against McCoy.  Plaintiff relies upon her answers to interrogatories and answers to DDOL questionnaires to challenge McCoy's management competency.

The United States Court of Appeals for the Third Circuit ("Third Circuit") has suggested that, because individual employees are not considered employers within the meaning of the ADEA statute, the ADEA does not provide for individual liability.  *Hill v. Borough of Kutztown*, 455 F.3d 225, 246 (3d Cir. 2006)(noting that although not raised, plaintiff could not have brought an ADEA claim against the mayor because the ADEA does not provide for individual liability); *see also Miller v. Maxwell's Int'l, Inc.*, 991 F.2d 583, 587 (9th Cir. 1993) (dismissal of plaintiff's complaint for failure to state a claim was proper because defendants, employees of a large corporation, were sued in their individual capacities); *Horwitz v. Board of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 610 (7th Cir. 2001); *Medina v. Ramsey Steel Co.*, 238 F.3d 675, 686 (5rh Cir. 2001); *Smith v. Lomax*, 45 F.3d 402, 403 (11th Cir. 1995).  *See also McKay v. Delaware State Univ.*, Civ. No.  99-219-SLR, 2000 WL 1481018, at *12 n.21 (D. Del. Sept. 29, 2000) (plaintiff concedes that there is no individual liability under the ADEA); *Walker v. The News Journal*, Civ. No. 06-138-MPT, 2008 WL 766788, at *3 n.21 (D. Del. Mar. 24, 2008) (the Third Circuit has explicitly rejected individual liability under the ADEA); *Perepchuk v. Friendly's Ice Cream Corp.*, Civ. No. 97-1988, 2000 WL 1372876, at *4 (M.D. Pa. Mar. 28, 2000) (finding due to the parallel structure of Title VII and the ADEA and a large body of convincing precedent from various circuits, the ADEA does not provide for individual liability).

This court, as well as other district courts in the Third Circuit, have determined that the ADEA does not provide for individual liability.  For the above reasons, the court will dismiss the ADEA claims against the individual defendants, McCoy and Schaefer.

### 2. **Hostile work environment**

Plaintiff's numerous complaints are, in effect, a claim of a hostile work environment.  She complains she was required to undergo a drug test, and was not reimbursed for tuition, promoted, or provided leave under the FMLA, all due to her age.  The hostile workplace theory permits a plaintiff's claim to be based on the cumulative effect of the defendants' actions, rather than on any one act of a defendant.  *See O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006) (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117-18 (2002)).  To establish a prima facie case that she was subjected to a hostile work environment, plaintiff must present evidence that:  1) she suffered intentional discrimination because of age; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected her; 4) the discrimination would detrimentally affect a reasonable person in the same position; and 5) the existence of respondeat superior. *Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006), *overruled in part on other grounds* by *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  In determining whether plaintiff's work environment was sufficiently hostile or abusive, the court considers the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with plaintiff's work performance.  *Faragher v. Boca Raton*, 524 U.S. 775, 787 (1998).

15

It is undisputed that plaintiff is over the age of forty. The record, however, does not support a finding that she was discriminated against on the basis of her age. With regard to the drug testing, the record reflects that employees, over and under the age of forty, were required to undergo the testing and that defendants provided a non-discriminatory reason for the drug testing - missing narcotics. Plaintiff provided no evidence to rebut defendants' proffered reason for the drug test.

Plaintiff claims that defendants promoted younger individuals, but did not promote her. The record reflects individuals younger than plaintiff were promoted and that, for several years, her performance reviews met expectations until her attendance became an issue. These facts lend credence to a prima facie case of discrimination. Plaintiff testified, however, that despite the posting of vacancies, she never applied for, or sought, a promotion. Moreover, she testified that she believed that her absenteeism would have been an impediment to a promotion. While plaintiff testified that she was not approached about a promotion, she also testified that she was aware that it was necessary that she express an interest in a promotion. Her failure to seek a promotion provides a non-discriminatory reason for the asserted failure to promote her. Similarly, plaintiff alleges that she was discriminated against because she did not receive tuition reimbursement, but she testified that she never sought it. A reasonable jury could not find discriminatory intent towards plaintiff particularly when she failed to seek tuition reimbursement, or to express an interest in, or apply for, a posted vacancy.

Finally, the record does not support a finding that plaintiff was denied leave under the FMLA because of her age. She was advised of the FMLA when she was hired, as evidenced by her signed acknowledgments. Plaintiff had attendance issues and

16

received verbal and written warnings, and her attendance problems were discussed on several occasions. Personnel records reflect that the FMLA was discussed with plaintiff on at least two occasions. Although plaintiff may have had legitimate reasons for her absences due to issues with family members, the record does not reflect that she sought leave under the FMLA at any time. Contrary to plaintiff's position, defendants were not required to seek her out to offer medical leave. There is nothing in the record to support her contention that she was denied leave under the FMLA on the basis of her age.

Even construing the facts in the light most favorable to plaintiff, a reasonable jury could not find that she was subjected to a hostile work environment. The evidence does not support a finding that plaintiff suffered intentional discrimination because of age, there was severe or pervasive discrimination, or that if such discrimination did exist it would have detrimentally affect a reasonable person in the same position. Therefore, the court will grant defendants' motion for summary judgment.

### 3. **Constructive discharge**

Plaintiff claims the she had to leave under unfavorable conditions and this caused her constructive discharge. Constructive discharge "occurs when an 'employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" *Spencer v. Wal-Mart Stores, Inc.,* 469 F.3d 311, 316 n.4 (3d Cir. 2006) (quoting *Goss v. Exxon Office Sys. Co.,* 747 F.2d 885, 887 (3d Cir. 1984)). A hostile work environment "will not always support a finding of constructive discharge" and to do so, plaintiff "must demonstrate a greater severity or

17

pervasiveness of harassment than the minimum required to prove a hostile working environment." *Id.* (citations omitted).

An employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge. *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992). Instead, the focus is on the reasonable person. *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1162 (3d Cir. 1993). Courts employ an "objective test to determine whether an employee can recover on a claim of constructive discharge." *Duffy v. Paper Magic Group*, 265 F.3d 163, 167 (3d Cir. 2001). Factors considered are: (1) a threat of discharge; (2) suggestions or encouragement of resignation; (3) demotion or reduction in pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; (6) unsatisfactory job evaluations. *Clowes*, 991 F.2d at 1161.

Plaintiff contends that she was constructively discharged because unfavorable conditions forced her resignation. As discussed above, the court has determined that plaintiff has not provided sufficient evidence to support her claim of age discrimination and the record does not support a finding that she was subjected to conditions sufficient to establish a hostile work environment. Accordingly, the court finds that the facts are insufficient to meet the greater severity and pervasiveness requirements to establish a constructive discharge. *See Dufy v. Paper Magic Group, Inc.*, 265 F.3d 163 (3d Cir. 2001) (rejecting a constructive discharge claim based on a pattern of conduct that included being passed over for a promotion, supervisors refusing to cooperate with the plaintiff, harassment, exclusion from meetings and training seminars, removal from committees, supervisor's derogatory remarks about the plaintiff's age and the resulting

18

deterioration of her health based on this treatment). In light of the record before the court, no reasonable finder of fact could conclude that plaintiff suffered under conditions that could be objectively described as being so intolerable that she had no course but to quit. For the above reasons, the court will grant defendants' motion for summary judgment on this claim.

### 4. Retaliation

Plaintiff alleges that defendants retaliated against her by providing negative employment references after she filed her charge of discrimination. To establish a prima facie case of retaliation, plaintiff must show: 1) she engaged in a protected activity; 2) after or contemporaneous with engaging in that protected activity, she was subjected to an adverse employment action; 3) the adverse action was "materially adverse;" and 4) there was a causal connection between her protected activity and the adverse employment action. *Hare v. Potter*, 220 F. App'x 120, 128 (3d Cir. 2007) (not published) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). "Although timing and ongoing antagonism have often been the basis for the causal link, . . . case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

An individual is not protected from all retaliation, but from retaliation that produces an injury or harm. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Hence, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have

19

dissuaded a reasonable worker from making or supporting a charge of discrimination.'"
*Id.* at 68 (2006) (citations omitted).  The court looks to material adversity because "it is
important to separate significant from trivial harms."  *Id.*  "[P]etty slights, minor
annoyances, and simple lack of good manners will not create such deterrence." *Id.*

Defendants contend that plaintiff has absolutely no proof of retaliation.  Plaintiff
testified that she felt that she was blackballed and could not find employment following
her resignation.  In her opposition to defendants' motion for summary judgment, she
explains her evidence that Rockford communicated with potential employers consists of
three emails.

Initially the court notes that, following her resignation from Rockford, plaintiff was
employed by two separate entities from May 2007 to January 2008.  There is nothing in
the record that indicates Rockford provided negative references for plaintiff.
Additionally, the court reviewed the "emails" to which plaintiff refers as supportive of her
claim.  They are actually two reports from Medical Staffing Network ("MSN") with entry
dates of July 31, 2007 and March 13, 2008, and an August 22, 2007 email regarding
plaintiff's potential employment with Correctional Medical Services ("CMS").[22]  (D.I. 36
June 30, 2009 intouch reports, Aug. 22, 2007 Williams email).

Plaintiff was employed by MSN as a registered nurse from August 24, 2001
through March 16, 2002, prior to the time of her employment with Rockford.  (*Id.* at MSN
June 30, 2009 letter)  MSN's June 30, 2009 report with its July 31, 2007 entry states,
"please do not hire - she was insubordinate and rude on the phone."  Its June 30, 2009

---

[22]There are two MSN's reports, both dated June 30, 2009.  Each contain different
dates for entry of information.

report with its March 13, 2008 entry states, "she called in wanting to reactivate. I told her she was not eligible." (*Id.* at MSN intouch reports) Granted, the reports contain negative information. They were not, however, generated by Rockford and have nothing to do with plaintiff's employment with Rockford but, rather, concern plaintiff's employment with MSN. The August 27, 2007 email appears to be from an employee of CMS and concerns its interest in hiring plaintiff. Notably, plaintiff was hired by CMS on September 10, 2007, and there is nothing to indicate that CMS received a negative report from Rockford prior to hiring plaintiff. (*Id.* at CMS Sept. 7, 2007 letter)

Plaintiff has failed to establish a prima facie case of retaliation. Although she engaged in a protected activity by filing her charges of discrimination, the record does not reflect that she was subjected to an adverse employment action for doing so. Indeed, immediately after her resignation, she was employed for approximately eight months. Nor does the record reflect that defendants provided negative information to plaintiff's potential employers. For the above reasons, the court will grant defendants' motion for summary judgment.

### C. Family Medical Leave Act

While not clear, it appears that plaintiff may be alleging a violation of the FMLA.[23] The purpose of the FMLA is "to balance the demands of the workplace with the needs of families." *Schaar v. Lehigh Valley Health Services, Inc.,* –F.3d–, No. 09-1635, 2010 WL 825257 (3d Cir. 2010) (quoting 29 U.S.C. § 2601(b)(1). The FMLA gives eligible employees the right to take up to twelve weeks off during a twelve month period "[i]n

---

[23]Defendants incorporated their FMLA discussion with their discussion on age discrimination.

order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition."[24]  29 U.S.C. § 2612(a)(1)(C).  FMLA leave may be taken intermittently, either when "medically necessary" or when agreed upon by the employer and employee, depending on the type of leave.[25]  29 U.S.C. § 2612(b)(1).  To exercise one's rights under the FMLA, an employee is required to:  (1) "make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer; and (2) provide the employer with not less than 30 days notice, before the date the leave is to begin, of the employee's intention to take leave."  29 U.S.C. § 2612(e)(2)(A) & (B).  If "the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable."  *Id.* at § 2612(e)(2)(B).

Once an employee is entitled to leave, the FMLA prohibits an employer from interfering with it or retaliating against an employee for taking it.  *Schaar*, 2010 WL 825257, at *2 (citing 29 U.S.C. § 2615(a) & (b).  Interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220(b) (2007).  To support a claim of interference of rights under the

---

[24]An "eligible employee" is one who has been employed "for at least 12 months by the employer" and has worked at least 1,250 hours in the previous 12 months.  29 U.S.C. § 2611.

[25]Unlike the ADEA, individual liability attaches under the FMLA when a supervisor has "exercised control" over a plaintiff's FMLA leave.  *See Spagnoli v.* Brown & Brown Metro, Inc., Civ. No. 06-424(FLW), 2007 WL 2362602 (D.N.J. Aug. 15, 2007); *see also Hewett v. Willingboro Bd. of Educ.*, 421 F. Supp. 2d 814, 817-818, n.4 (D.N.J. 2006) (holding that individual employees can be liable for violations of the FMLA if they are acting on behalf of the employer).

FMLA, plaintiff must demonstrate that she was entitled to the benefits and that her employer "illegitimately prevented [her] from obtaining those benefits." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007). Retaliation claims include the "use [of the] taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2006) (citing 29 C.F.R. § 825.220(c)).

The complaint alleges that defendants "never approached plaintiff about taking time off under the FMLA," and she seems to allege that defendants interfered or denied her leave under the FMLA. (D.I. 1) The Third Circuit has recognized that the FMLA imposes a duty on an employer to advise an employee of her rights under the Act. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 143 (3d Cir. 2004). To establish a claim for interference based upon a failure to inform an employee of her FMLA rights, plaintiff must show that defendants' failure to give her the required notification caused her injury, and that she suffered prejudice as a result of the alleged interference. *Id.* at 143, 146. The duty to inform does not necessarily translate into a duty to separately inform an employee of her rights under the FMLA. *See Capilla v. Whitesell Constr. Co.*, 271 F. App'x 261, 267 (3d Cir. 2008).

The record reflects that plaintiff never sought leave under the FMLA. Additionally, the record does not support a finding that defendants interfered or discouraged plaintiff from taking leave or that plaintiff was unaware of the FMLA. Rather, the facts indicate that plaintiff was offered counseling to discuss her attendance but she opted not to follow up. It appears that many of plaintiff's absences were due to her sister's medical condition, but caring for one's sibling is not a guaranteed right under

23

the FMLA. Moreover, despite her repeated absences, plaintiff's employment continued. While it is not clear from the record when plaintiff was first advised of the FMLA, she signed acknowledgments of receipt of information regarding the FMLA and the parties agree that, during the last meeting before her resignation in April 2007, she was handed a FMLA form that she chose not to complete. Instead, she chose to resign. In considering the record, the court concludes that it does not support a finding that the actions of defendants resulted in prejudice to plaintiff.

Based upon the foregoing, a reasonable jury could not conclude that defendants violated plaintiff's rights under the FMLA. Therefore, the court will grant defendants' motion for summary judgment on this issue.

## D. Supplemental Claims

Because the complaint fails to state a federal claim, to the extent plaintiff raises claims under Delaware law, the court declines to exercise jurisdiction over the supplemental state law claims. 28 U.S.C. § 1367; De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003).

## V. CONCLUSION

For the above reasons, the court will grant defendants' motion for summary judgment. The court declines to exercise supplemental jurisdiction over any supplemental claims.

An appropriate order will issue.

24